UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:08CR441 |
| Plaintiff, | |
| vs. | Judge John R. Adams |
| GENERAL ENVIRONMENTAL MANAGEMENT, LLC | SENTENCING MEMORANDUM |
| Defendant. | |

I. INTRODUCTION

Defendant General Environmental Management, LLC ("GEM") submits this Sentencing Memorandum for consideration by this Honorable Court when it sentences GEM on January 21, 2009. Based on the information set forth herein and in the pre-sentence investigation report, GEM respectfully requests that this Honorable Court impose no penalty.

II. THE CIRCUMSTANCES OF THE OFFENSES

GEM was an industrial wastewater pre-treatment company located in the industrial flats in Cleveland, Ohio. GEM's business, in part, was to accept industrial wastewater from customers by tanker truck, pre-treat the wastewater to remove pollutants, and then discharge the pre-treated wastewater to the Northeast Ohio Regional Sewer District ("NEORSD"), where the wastewater would undergo further treatment before being discharged to the waters of the state. GEM at all times had a permit, referred to as an Administrative Order or "AO," issued by NEORSD. The AO contains many provisions, but can be considered in terms of its four main parts - (1) discharge parameters or effluent limits (Part 2), (2) monitoring or testing requirements

(Part 3), (3) reporting requirements (Part 4), and (4) miscellaneous requirements and conditions (passim).  GEM's AO was amended from time to time over the years GEM was in business. Currently, GEM is out of business and no longer is accepting, treating and discharging wastewater.  GEM no longer has an AO from NEORSD.

A. Count I

One of the miscellaneous provisions of GEM's AO was that it obtain pre-approval from NEORSD prior to accepting a new waste from a customer.  With respect to the wastewater shipments that are the subject of Count I, the necessary approval was given by NEORSD after the shipments were received, rather than before as required by the AO.  *NEORSD gave its approval by fax the next day.* The approval was received at the time the wastewater was treated and discharged to NEORSD.  The mistake in accepting the waste stream likely was due to understandable confusion because other, similar waste streams from the same customer, Columbus Steel Drum, were pre-approved by NEORSD and were regularly accepted for treatment by GEM.  The acceptance of the wastewater did not violate any provision in the AO other than the requirement that waste streams be approved prior to acceptance, and did not result in any non-compliance with the effluent limitations in GEM's AO.  GEM has accepted full responsibility for the misrepresentations that were made after the fact to representatives of NEORSD regarding GEM's initial acceptance of the waste stream.

B. Count II

With respect to Count II, the conduct described here also did not result in any non-permitted discharges.  The conduct resulted from a logistical problem.  Count II describes a former practice at the GEM facility that entailed transferring drummed hazardous wastewater to the custody of a "second transporter," pending acceptance of the wastewater by GEM.  The

manifests that reflected that transfer amounted to false statement because, in fact, no second transporter really took custody of and transported the drums.  Rather, they were held for a short time in a transporter's trailer at the GEM facility.

Clearly, Ohio's hazardous waste regulations permit a transporter to transfer hazardous waste to a second transporter, and the manifest form is designed to reflect this situation.  A transporter may store hazardous waste for ten days without being subject to hazardous waste regulations applicable to facilities.  (Ohio Administrative Code § 3745-53-12).  Also, under Ohio's hazardous waste regulations, it is permissible for a transporter to authorize persons to sign a manifest on its behalf.  Nowhere in the regulations is there a requirement that a transporter must engage in actual movement or transportation.  The regulations, therefore, appear to provide for a legal solution to a practical problem that is faced by many receiving facilities.

The problem is one of logistics.  A non-TSD facility cannot accept, for any period of time, hazardous waste, except, a wastewater treatment facility can accept hazardous waste in the form of wastewater.  In order for the exemption to apply, the hazardous wastewater must be received directly into a wastewater treatment unit.  The receiving facility also is subject to categorical wastewater treatment regulations, however, and cannot accept any wastewater, but must test it to insure that its acceptance will not cause it to violate the categorical wastewater treatment standards that are applicable to the facility.  In the case of wastewater received by tanker truck, the facility can take a sample from the truck, the truck can be staged for the time necessary to obtain analytical results, and the waste can then be either received, or redirected to another receiving facility.  In the case of wastewater received in drums, however, the facility needs a way to stage the drums from the transporter, sample them, and hold them for the time necessary to obtain analytical results.  The rules pertaining to second transporters theoretically

can be used to provide a legally permissible mechanism for solving this practical dilemma.

Long ago, in July 2005, GEM recognized that its practice of signing manifests to show the transfer of drums to a second transporter was wrong. GEM discussed its drum handling practices with Ohio EPA representatives. When GEM was advised that Ohio EPA did not approve of its drum handling practices, it immediately ceased accepting all drummed hazardous waste and it sent written notifications to its customers. GEM did not have any financial interest in accepting hazardous waste in drums, and did so only as an accommodation to its customers. GEM was not interested in engaging in a practice that the Ohio EPA questioned. Importantly, however, this practice did not result in the acceptance or discharge of non-permitted waste streams, and did not result in any pollution of the environment.

The same type of problem described above has been the subject of Ohio EPA enforcement actions with respect to other non-TSD facilities that improperly receive drummed hazardous waste. For example, a non-TSD facility in Medina, Ohio, was determined to have accepted thousands of drums of hazardous waste which it held for hundreds of days at a time before re-directing them to appropriate TSD facilities or back to the generator, without any paperwork that would serve to inform Ohio EPA of the existence or location of the drums. In its enforcement response, Ohio EPA acknowledged the practical dilemma and, in that case, entered into Director's Findings and Orders that permitted the non-TSD facility a ten-day grace period during which it is now permitted to hold incoming hazardous waste, notwithstanding it is a non-permitted facility.

    C.    <u>Count III</u>

The conduct that forms the basis of Count III concerns compliance with the reporting requirements of the AO. Count III alleges that GEM's monthly sewer reports were false

because, from time to time, it reported the concentration of MEK in the discharge as a weighted average of the concentrations in two discharged tanks. GEM does not dispute that from time to time it discharged two retention tanks, and it does not dispute that in its monthly reports, it reflected the discharge of both with a blended, or averaged, number, and GEM agreed to enter a misdemeanor plea with respect to such conduct. It is important, however to place the conduct in context for purposes of punishment.

GEM operated pursuant to a permit, called an "Administrative Order" ("AO") written and issued by NEORSD. Since June 27, 2003, the AOs have incorporated the Centralized Waste Treatment Point Source Category pretreatment standards in 40 C.F.R. 437. Count III relates to the period from January 1, 2004 through March 31, 2005. During this period of time, GEM was subject to seven successive AOs drafted and issued by NEORSD. A copy of the AO that was issued on August 6, 2004, is attached as Exhibit 1. For purposes of Count III, these AOs have three main components: effluent limitations, monitoring requirements, and reporting requirements. The key features of these are as follows:

- The effluent limits for the GEM facility were established with respect to "*discharge points*," which are designated by a number. The discharge points typically are described in the AOs as a group of multiple retention tanks. For example, in AO No. 2992-700-437ES02-R, dated June 27, 2003, discharge point 01 is described as "from the retention tanks (Tanks # 118, 119, 120, 121, 122 and 124) in the plant collection pit area." None of the AOs describe a "discharge point" as a *single* retention tank.

- With respect to such discharge points, the AOs set forth effluent limitations for various parameters or chemical constituents. These are expressed in the AOs in various ways, including as daily maximums, monthly averages, pounds per day, milligrams per liter, gallons per day, and gallons per hour.

- In addition, the AOs provided for "Supplementary Effluent Limitations." According to the terms of the AOs, "[s]upplemental limits apply to the total *combined* wastewater flow discharged to the municipal sewer by GEM from any industrial or non-industrial points located at their facility." This would include not only the numbered and described "discharge points," but also non-industrial points such as the office sanitary sewer discharges. These supplemental limits, therefore, apply to the *combined* discharge from all

of the retention tanks collectively, as well as all other "industrial and non-industrial sources." These supplemental limits do not apply on an individual retention tank basis. The limit for MEK that is the subject of Count III, is a supplemental limit.

- Part 3 of each AO established certain monitoring requirements. Part 3-A provides that GEM shall "monitor Discharge Point 01" for various parameters, by taking samples in the separate retention tanks. The frequency of sampling is unclear. For some parameters, the frequency is listed as "1/Batch," but for most parameters, including MEK, the frequency is listed as "Note #6" and Note #6 discusses the analysis and compositing of samples, *not* how often samples must be taken.

- The term "batch" is not defined, either in the AOs or in any applicable regulations. The term is used in Part 3 of the AO in the context of monitoring "discharge points," which are described as a group of multiple tanks, but the sampling locations are, for the most part but not always, in a retention tank. Accordingly, the term "batch" is ambiguous, and is subject to interpretation. There are no effluent limits that apply to a "batch," regardless of how it is defined.

- The monitoring requirements do not correlate to the effluent limitations that must be met. The effluent limitations must be met on a daily or weekly basis, for a "discharge point" or for all facility discharges "combined." The sampling requirements, in terms of location and frequency, where frequency can be determined, do not correlate with the effluent limits.

- From an operational standpoint, individual retention tanks sometimes were discharged multiple times in one day, and sometimes are discharged less frequently than daily. This is another reason why the monitoring requirements do not correlate to the effluent limits.

- Inevitably, if sampling is performed on individual retention tanks, the determination of whether an effluent limit is met at the "discharge point" or, with respect to the supplemental limits, to the total *combined* wastewater flow from the facility, is a matter of mathematical calculation, including calculations aimed at deriving an average concentration for multiple tanks based on individual tank concentrations and volumes within a given time period.

- Part 4 of each AO sets forth GEM's reporting requirements. Essentially, GEM was obligated to report the results of its monitoring "summarized" once per month with the overall purpose of demonstrating that effluent limits were being met. The monthly report is supposed to contain the nature and concentrations of all pollutants "required for analysis in each *daily batch*." The use of the term "daily batch" here is inconsistent with the use of the word batch in Part 3 of the AO. The term "daily batch" was not defined in any AO or in any applicable regulation.

- The reporting requirements in Part 4 provided:

    The pollutants required for analysis on a daily composite basis shall be reported as a daily line item in the monthly reports. The pollutants required for analysis on a weekly composite basis shall be reported as a weekly line item in the monthly

reports.

Notwithstanding that part 4 *did not require* reporting on a tank by tank basis, the sampling requirements in Part 3 *were* on a tank by tank basis. Results of any voluntary additional monitoring were not required to be reported monthly, but were supposed to be reported semi-annually until June 2004 when Section 4.B. of the AO was revised to provide for any such results to be included in the monthly reports.

- Thus, the only way to prepare the reports in the format specified is *not* to report actual test results, but to undertake mathematical calculations, including calculations aimed at deriving an average concentration for multiple tanks based on individual tank concentrations and volumes, and then try to relate them to the effluent limitations which are set for groups of tanks or the entire facility *combined*.

Count III, to which GEM has agreed, assumes that a single retention tank was a batch, and it assumes that the AOs obligated GEM to report on a retention tank by retention tank basis. Despite the fact that the effluent limitations applied only to multiple tanks together, Count III assumes that it was impermissible to discharge two retention tanks together in order to meet effluent limits. It also assumes that "summarizing" the analytical results obtained from the monitoring and reporting the results in terms of daily and weekly averages required reporting actual test results and cannot include mathematical calculations. The AOs with which GEM strived to comply were fraught with internal inconsistencies and ambiguities. Whether GEM reasonably should have made all of these same assumptions should be taken into account in determining the level of punishment warranted by the conduct described in Count II.

Following a lengthy investigation which began with the inquiry into the circumstances that form the basis of Count I, the government charged, and General Environmental Management, LLC entered guilty pleas, with respect to the three counts. GEM cooperated fully in the investigation and encouraged its employees to cooperate as well.

III. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Armed with no more than an entrepreneurial spirit and sales and marketing experience in

the industrial waste industry, in 2001 Eric Lofquist and Scott Forster acted on the opportunity to purchase the GEM facility from its previous owner in what was to have been a seller-financed asset purchase.  At the time of the purchase, they did not fully appreciate the extent to which their purchase agreement with the seller, who proved to be unscrupulous in many ways, would leave them saddled with a crumbling facility, unexpected demands from their predecessor's creditors, a past history of facility non-compliance and recalcitrance, unmet regulatory compliance obligations requiring large unforeseen expenditures, and in short order, expensive and protracted litigation over the purchase of the company itself that resulted in the company being placed into receivership for a year.

Scott and Eric, with hard work and a commitment to continuous improvement, succeeded in overcoming many of those obstacles for a number of years.  They obtained conventional bank financing from FirstMerit Bank, which they personally guaranteed, that enabled them to settle the litigation with the seller, acquire clear title to the facility, and become free of the receivership.  They invested over $9 million from operating revenues in capital improvements, upgrades and repairs to the facility.  Over the years, GEM increased its workforce by over 50%, at one time employing 65 persons in high-pay union and non-union jobs.

Over the years, GEM demonstrated a good record for environmental compliance.  Like most companies in the environmental waste and recycling industries that are subject to extensive and complicated regulation, GEM has received its share of notices of violation (NOVs) from Ohio EPA and the Northeast Ohio Regional Sewer District (NEORSD).  GEM provided this information to the Probation Department and it is summarized in the Presentence Investigation Report, which notes that some of the NEORSD NOVs were the result of self-reporting, and none involve "similar incidents of misconduct."  Indeed, both before and after the incidents which

form the subject of this case, GEM self-reported arguably more serious regulatory violations to the respective agencies. Throughout 2007 and 2008, GEM was determined to be "in compliance" with its discharge limitations based on independent sampling conducted by NEORSD. (See letters attached as Exhibit 2). Other than this case, none of the NEORSD or Ohio EPA NOVs have resulted in enforcement action and GEM has not been assessed any penalty in connection with them.

At relevant times during the course of the investigation of this matter, GEM was a member of the Better Business Bureau, and was a partner with the City of Cleveland, technical experts and other local businesses in the Cuyahoga Valley Initiative, a collaborative effort aimed at enhancing the economic heritage of the Cuyahoga Valley region. GEM also was a member of Maingate Business Development Corporation. GEM's president, Eric Lofquist, served on Maingate's Board of Trustees from 2002 to 2006, was vice president of the board in 2004, and was president of the board in 2005. Mr. Lofquist also served on Cuyahoga County's Blue Ribbon Task Force, formed to set a long-term economic agenda for Cuyahoga County. Also in 2005, GEM was the recipient of the Cuyahoga County Commissioner's Joseph LoPresti Community Commitment Award. GEM provided financial support to a variety of local community organizations, including Cops for Kids, NASA's First Robotics program, Cleveland Community Shares, the University Settlement, and various local school sports programs. GEM also provided a different kind of support to the community, working with Alternatives Agency, Inc. by providing employment opportunities through the Orion Pre-Release Center's work program transitioning ex-convicts back into the workforce.

In April, 2006, GEM suffered a serious setback when a welding contractor working on a catwalk at the facility caused an explosion and fire that destroyed the western portion of the

facility, including the plant laboratory.  After a complete shut-down that lasted about a month, GEM was able to re-open a portion of its facility and was able to process mostly oil-subcategory waste streams at a greatly reduced volume.  However, GEM's lender, FirstMerit, ultimately exercised its lien on the property insurance proceeds rather than allow the facility to use the insurance funds to rebuild.  This and other factors, including the City of Cleveland's continuing legal efforts to force expensive fire code upgrades at the facility, eventually led to GEM's decision to close its doors.  In 2008, GEM finally ceased all of its business operations.  GEM filed its dissolution with the Ohio Secretary of State in January 2009.

GEM's and its former subsidiary ESG Holdings LLC's Balance Sheets and Profit & Loss Statements through October 31, 2008, are attached.  At that time, GEM had accounts receivable of approximately $20,000 and accounts payable of approximately $308,000. As of December 12, 2008, its accounts payable amounted to $240,150.  (See, P&L Statements and A/P Aging Summary, attached as Exhibit 3)  In addition, in early 2008, the Cleveland Bakers and Teamsters Pension Fund advised GEM that GEM's estimated pension plan withdrawal liability was approximately $627,648.00.  (See, letter attached as Exhibit 4).  That amount will have grown over the course of 2008, but has not been recalculated.

The imposition of a fine in this case will reduce further GEM's ability to pay its remaining creditors.  The payment of a fine would serve no purpose of deterrence or punishment at this juncture.  Section 8C3.3 of the United States Sentencing Guidelines, entitled "Reduction of Fine Based on Inability to Pay," authorizes this Court to reduce a fine below the recommended guideline range based on an organization's inability to pay.  The Presentence Investigation Report does not make any recommendation with respect to the payment of a fine.

IV.     CONCLUSION

General Environmental Management, through undersigned counsel, respectfully requests that this Honorable Court impose no fine.


Dated:  January 12, 2009                    Respectfully submitted,

                                            BROUSE McDOWELL

                                            /s/ Keven Drummond Eiber
                                            Keven Drummond Eiber (0043746)
                                            1001 Lakeside Avenue, Suite 1600
                                            Cleveland, Ohio  44114
                                            Telephone: 216.830-6830
                                            Facsimile: 216.830-6807
                                            Email: keiber@brouse.com
                                            Attorney for Defendant
                                            General Environmental Management LLC


CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed electronically on January 12, 2009.  Parties may access this filing through the Court's electronic filing system.


                                            /s/ Keven Drummond Eiber
                                            Keven Drummond Eiber
                                            Attorney for Defendant General
                                            Environmental Management LLC